**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **NEWTON DE MOURA GOMES, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 26-cv-01883 (APM)** |
| | ) | |
| **MARCO RUBIO,** | ) | |
| *in his official capacity as Secretary of State*, **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**<u>MEMORANDUM OPINION</u>**

## I.      INTRODUCTION

Plaintiff Newton De Moura Gomes ("Plaintiff") is a Brazilian national who has applied for an immigrant visa through the EB-5 program, under which a noncitizen can secure permanent residency by investing in designated commercial enterprises that create jobs in the United States. His wife and two daughters, also Plaintiffs in this action, are derivative beneficiaries of Plaintiff's application.  They bring this suit challenging a State Department policy applicable to nationals of 75 countries—including Brazil—that requires consular officers to refuse all immigrant visa applicants until such time as the agency develops new policies, regulations, and guidance to enable consular officers to assess if an applicant might become dependent on public assistance once in the United States, or what is known as a "public charge" ("Public Charge Policy").  Plaintiffs contend that this policy has unlawfully stalled final adjudication of the visa application.

On May 29, 2026, Plaintiffs filed this suit.  About two weeks later, Plaintiffs sought a preliminary injunction that would prohibit Defendants—the Secretary of State and the Department of State—from applying the Public Charge Policy to Plaintiffs, require final adjudication of

Plaintiff's application within seven days, and compel prompt issuance of their visas if there are no lawful grounds for inadmissibility or other statutory basis for refusal. Defendants opposed the motion for a variety of reasons, including that the doctrine of consular nonreviewability forecloses judicial review and the Public Charge Policy is lawful. The parties then agreed to consolidate the preliminary injunction with the merits, so the court treats the motion as one for summary judgment.

Because the Public Charge Policy contravenes the Immigration and Naturalization Act (INA) and because Plaintiffs have made out a claim of agency action unlawfully withheld, the court grants Plaintiffs' motion and enters judgment in their favor.

## II.    BACKGROUND

### A.    Legal Framework

The EB-5 program is an employment-based visa program under the INA available to foreign nationals who invest in qualifying job-creating enterprises in the United States. *See Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 334 (D.C. Cir. 2023); 8 U.S.C § 1153(b)(5). "EB-5 visas are available to noncitizens entering the country to engage in a new commercial enterprise that 'will benefit the United States economy by creating full-time employment for not fewer than 10 United States citizens, United States nationals,' or certain other residents." *See Da Costa*, 80 F.4th at 335 (quoting 8 U.S.C. § 1153(b)(5)(A)(ii)); *see also Del. Valley Reg'l Ctr., LLC v. DHS*, 106 F.4th 1195, 1198 (D.C. Cir. 2024) (describing an EB-5 immigrant visa applicant's path to permanent residence).

Ordinarily, to adjudicate an immigrant visa application, a consular officer will consider section 212(a) of the INA, which contains various grounds to deem a foreign national ineligible for a visa. 8 U.S.C. § 1182(a). Among them is if the applicant is likely to become a "public charge." *See id.* § 1182(a)(4)(A). The Department of State Foreign Affairs Manual (FAM) defines

a "public charge" as "an individual, [who] after admission into the United States, is likely to become primarily dependent on the U.S. Government for subsistence." 9 FAM 302.8-2(B)(1). In determining whether an applicant is likely to become a public charge, the INA directs consular officers to "at a minimum consider" the applicant's age; health; family status; assets, resources, and financial status; and education and skills. 8 U.S.C. § 1182(a)(4)(B)(i).

On January 14, 2026, Defendant Secretary of State Marco Rubio issued a policy to all diplomatic and consular posts titled "Pausing Immigrant Visa Issuances for Nationalities at High Risk of Public Charge" ("Public Charge Policy"). J.A. of the Certified Administrative R., ECF No. 12, Index for A.R., ECF No. 12-1 [hereinafter A.R.], at 1–4 [hereinafter Policy]. The Public Charge Policy provides that, effective January 21, 2026, "consular officers must refuse under section 221(g) of the Immigration and Nationality Act to **all immigrant visa applicants** who have not been refused under another ground of ineligibility, if the applicant is a national" from one of 75 countries. Policy ¶ 2; *see also* A.R. at 6–7. According to the Secretary, "[a]pplicants from these countries are at a high risk for becoming a public charge and recourse to local, state, and federal government resources in the United States." Policy ¶ 2. To address this concern, the Department of State is "undergoing a full review of all policies, regulations, and guidance to ensure that the highest level of screening and vetting of every visa applicant." *Id.*

The Public Charge Policy sets forth clear instructions on how consular officers should handle immigrant visa applications of nationals from the 75 countries. Applicant interviews should proceed, and consular officers "should continue to adjudicate all immigrant visa cases and carefully evaluate all potentially applicable grounds of ineligibility, including assessing whether an applicant is likely to become a public charge, in accordance with guidance in 9 FAM 302.8-2." Policy ¶ 4. "If an officer believes an applicant is likely to become a public charge and ineligible

under INA section 212(a)(4)([A]) [8 U.S.C. § 1182(a)(4)(A)], the officer should refuse the applicant under that ground and include detailed case notes explaining this finding." *Id.* "Officers should assess all other potential grounds of ineligibility first, and if an officer has not refused the applicant under any other ground, the officer should make detailed case notes explaining all aspects of the case . . . where additional information could yield more data concerning the applicant's eligibility vis-à-vis 212(a)(4)." *Id.* "Officers should then refuse the applicant 221(g) while the Department develops additional screening and vetting tools, policies, and operations to more accurately identify any [immigrant visa] applicant likely to become a public charge." *Id.* More than six months after the Policy's issuance, the State Department has not announced any new "vetting tools, policies, and operations."

The Public Charge Policy also addresses what to do if an applicant demonstrates that they are *unlikely* to become a public charge. "If an officer refuses an applicant under [8 U.S.C. § 1182(a)(4)] and then the applicant provides additional evidence that demonstrates he or she overcomes the public charge refusal, the consular officer should write detailed case notes . . . and refuse the applicant 221(g)." *Id.* ¶ 5. So, even if an applicant can show that they are not likely to become a public charge, the consular officer must refuse the visa request. The Public Charge Policy also instructs how to handle cases of already-approved applicants. If the visa has not yet been printed, "the consular officer must refuse the case under 221(g), inform the applicant, and post may not print the visa foil." *Id.* ¶ 9. Even when the visa foil has printed "but has not left the consular section," the consular officer must reopen the case and refuse the visa. *Id.*

There are two identified exceptions to the blanket-refusal directive. It does not apply to dual nationals—that is, a person who is a national of both a country subject to the Public Charge Policy and a country that is not. *Id.* ¶ 8. And, if "an applicant is able to demonstrate his or her

4

travel would serve a specific U.S. national interest, consistent with Executive Order 14150 'America First Policy Directive to the Secretary of State,' which directs the Secretary of State to always put America and American citizens first," the applicant may be excepted. *Id.* Consular officers must contact a visa fraud prevention analyst "to discuss appropriate steps to robustly assess the applicant's eligibility under INA section 212(a)(4)[(A)]."

### B.     Factual Background

Plaintiff Newton De Moura Gomes is a Brazilian national. Pls. Mot. for Prelim. Inj., ECF No. 3 [hereinafter Pls.' Mot.], Ex. B, ECF No. 3-4 [hereinafter Gomes Decl.], ¶ 2. Plaintiff is married and has three daughters. *Id.*; Pls.' Mot. for Leave to File Suppl. Evidence, ECF No. 11 [hereinafter Pls.' Suppl. Mot.], Ex. B, ECF No. 11-3, ¶¶ 4–10. A successful entrepreneur in the cable television and telecommunications industries, Plaintiff in December 2018 invested $500,000 to fund the development and operation of a hotel in Arizona, an investment that qualified him as a potential EB-5 visa recipient. Gomes Decl. ¶ 7; Compl., ECF No. 1, ¶¶ 34–35. His wife and two youngest daughters, also Plaintiffs in this case, are derivative beneficiaries of his application. Compl. ¶¶ 77–79.

Sadly, in 2014, Plaintiff was diagnosed with a rare form of cancer, adenoid cystic carcinoma and in 2022 was diagnosed with Stage IV metastatic oropharyngeal cancer to the lungs. *Id.* ¶¶ 39–42. His cancer "is considered terminal and incurable," though "it is presently being managed and monitored." Pls.' Suppl. Mot., Ex. A, ECF No. 11-2 [hereinafter Herchenhorn Ltr.], at 1. "Because of his highly fragile clinical state and incurable disease," a treating physician has advised that "it is medically reasonable and extremely important for him to resolve major legal, immigration, family, and life-planning matters as promptly as possible." *Id.* at 2.

5

Plaintiffs sat for a visa interview at the U.S. Consulate General in Rio de Janeiro on December 17, 2025.  Compl. ¶ 63.  The consular officer, however, refused the application because Plaintiff had not yet completed a medical examination and then placed the application in administrative processing.  *Id.* ¶ 64; *see also* Pls.' Mot., Ex. L, ECF No. 3-14.[1]  On April 14, 2026, Plaintiff provided a completed medical examination.  Compl. ¶ 68.  He also "submitted financial records to demonstrate that he and his family would not be classified as public charges."  *Id.* ¶ 69

About a month later, on May 18, 2026, Plaintiff inquired about the status of his application.  Notice of Suppl. Evidence, ECF No. 15 [hereinafter Pls.' Second Notice], Ex. A., ECF No. 15-1.  The seemingly same-day boilerplate response referenced "the pause implemented in the immigrant visa processing" and provided a link to the State Department webpage on the Public Charge Policy.[2]  *Id.*  Not long after, on May 28, 2026, Plaintiff's counsel confirmed that the adjudication of Plaintiff's application had stopped because of the Public Charge Policy.  Scott Riedmann, the Minister Counselor for Consular Affairs at the U.S. Embassy in Brazil, the Embassy's highest-ranking consular officer, advised that "the Administration had paused the issuance of immigrant visas for nationals of certain countries, including Brazil, while it evaluated public-charge policy, regulation, and implementation within the immigrant visa process."  Pls.' Second Notice, Ex. B, ECF No. 15-2 [hereinafter Risch Decl.], ¶¶ 3, 9–11.  Riedmann further stated that "'[g]iven this policy and guidance, post would not be able to pursue an exception for this case.'"  *Id.* ¶ 11.

---

[1] A question also arose about the eligibility of Plaintiff Alice Nunes Gomes, but that issue was resolved to the consulate's satisfaction and poses no impediment to approval.  Compl. ¶¶ 63, 65–66; Pls.' Mot., Ex. K, ECF No. 3-13.

[2] The link in the exhibit is dead, but the current link is here: https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-processing-updates-for-nationalities-at-high-risk-of-public-benefits-usage.html.

## C.      Procedural Background

The next day, Plaintiffs filed this suit.  *See generally* Compl.  Their complaint alleged four violations of the Administrative Procedure Act: (1) unlawful withholding of final adjudication of Plaintiff's visa application (Count I); (2) undue delay in the final adjudication of the application (Count II); (3) the Public Charge Policy is an *ultra vires* executive action (Count IV); and (4) the Public Charge Policy is arbitrary and capricious and contrary to law (Count V).  Plaintiffs also sought a writ of mandamus (Count III).

Shortly thereafter, Plaintiffs moved for a preliminary injunction.  *See generally* Pls.' Mot. The relief requested was effectively two-fold.  First, they asked to enjoin Defendants from applying the Public Charge Policy to Plaintiff's application.  Pls.' Mot., [Proposed] Order, ECF No. 3-1, at 1.  And second, they requested an order requiring Defendants to complete adjudication of the application within seven days and, "if no lawful, individualized ground of inadmissibility or other statutory basis for refusal exists," then to issue visas to Plaintiffs.  *Id.* at 1–2.  Importantly, Plaintiffs did not seek as relief, either in their complaint or motion, vacating the Public Charge Policy as to all immigrant visa applicants in the affected countries.  *See* Compl. at 26–27; *see also* Pls.' Mot. at 19 (seeking only "narrowly tailored relief").

The court held hearings on July 21, 2026, and July 23, 2026, during which the parties agreed to consolidate Plaintiffs' motion for injunctive relief with a hearing on the merits. *See* Prelim. Inj. Hr'g (draft), July 23, 2026 [hereinafter 7/23/26 Hr'g Tr.], at 2:2-8; Fed. R. Civ. P. 65(a)(2).  That obviated the need for the court to consider irreparable harm and the equitable injunction factors.[3]   Defendants also declined the opportunity to seek discovery to

---

[3] It also means the court need not address Defendants' lead argument that Plaintiffs' motion must be denied relief because they seek "ultimate relief" in a preliminary posture.  Defs.' Mem. in Opp'n to Pls.' Mot., ECF No. 8, at 7–8.

challenge Plaintiffs' factual averments.  7/23/26 Hr'g Tr. at 12:24–13:21.  Accordingly, the court

treats Plaintiffs' motion as one for summary judgment and rules on the present record.

## III.   LEGAL STANDARD

When evaluating a motion for summary judgment under the APA, "the Rule 56 standard

does not apply."  *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 36 (D.D.C. 2017).  Instead, "the

district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law."

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks

omitted).  The court must "decid[e], as a matter of law, whether the agency action is supported by

the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club

v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).

## IV.   DISCUSSION

### A.   Subject Matter Jurisdiction

Before discussing the merits, the court considers its subject matter jurisdiction.  The court

sua sponte raised this question with the parties because the factual record, at least initially, was

unclear as to whether Plaintiff's application in fact remains refused because of the Public Charge

Policy or for some other independent reason.  Prelim. Inj. Hr'g (draft), July 21, 2026 [hereinafter

7/21/26 Hr'g Tr.], at 2:21–12:7.  The open question therefore was whether Plaintiffs have satisfied

the causation and redressability prongs of standing.  *See Diamond Alt. Energy, LLC v. EPA*, 606

U.S. 100, 111–12 (2025) (addressing those two factors).

They have.  The Minister Counselor for Consular Affairs at the U.S. Embassy in Brazil,

Scott Riedmann, confirmed on May 28, 2026, that adjudication of Plaintiff's application "had

paused" due to the Public Charge Policy and, as a result, "post would not be able to pursue an

exception for this case."  Risch Decl. ¶ 11.  Defendants do not contend otherwise.  *See generally*

Defs.' Opp'n. Causation is therefore established. So, too, is redressability, as the relief sought—an injunction barring application of the Public Charge Policy to Plaintiff's application—would remedy the harm.

**B.      Merits**

To secure his demand for final adjudication of his application, Plaintiff must make two showings. First, he must establish that the Public Charge Policy is contrary to law or arbitrary and capricious in violation of the APA. Second, he must demonstrate that the agency is unlawfully withholding final adjudication of the application, or such action is unreasonably delayed. Success on the first issue would result in the removal of the Policy as a barrier; success on the second would compel the agency to act on his application.

*1.      Contrary-to-Law APA Claims*

a.      Final agency action

The court's consideration of the merits begins with Plaintiffs' contrary-to-law APA claim (Count V). Defendants' first line of defense is that Plaintiffs' challenge is not actionable because the Public Charge Policy is not a final agency action. Defs.' Mem. in Opp'n to Pls.' Mot., ECF No. 8 [hereinafter Defs.' Opp'n], at 14–17. They are incorrect.

The term "agency action" "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). To be "final," that action need only "mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

The Public Charge Policy readily satisfies both *Bennett* factors. In evaluating the first, courts must consider "whether the action is 'informal, or only the ruling of a subordinate official,

9

or tentative.'"  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967)).  There is nothing "informal" about the Public Charge Policy.  The Secretary of State issued it, directed it to all diplomatic and consular posts, and identified it as an "action request."  Policy ¶ 1.  He surely believed it was the consummation of the decisionmaking process.  Defendants do not argue otherwise.  *See* Defs.' Opp'n at 14–16.  As for the second *Bennett* factor, the Public Charge Policy plainly has legal consequences.  It "reads like a ukase.  It commands, it requires, it orders, it dictates."  *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).  While in effect, consular officers must refuse immigrant visas for all applicants from 75 countries (except dual nationals).  It leaves them with no discretion.  And, of course, legal consequences follow for the visa-hopeful: their application is refused and thrown into a state of uncertainty.  *See Sangster v. Rubio*, No. 3:25-cv-00447-ART-CSD, 2026 WL 222316, at *3 (D. Nev. Jan. 28, 2026) ("Legal consequences certainly flow from the implementation of [the Public Charge Policy].  It is currently in effect, and while it is in effect, the Department of State will not approve any immigrant visas for nationals of seventy-five countries.").

Defendants respond that the Public Charge Policy does not fix rights or obligations because it does not "alter any applicant's legal status, determine admissibility, or even compel a particular outcome in any individual case."  Defs.' Opp'n at 15.  That is flatly incorrect.  The Policy does "compel a particular outcome" in every covered case: refusal of the application.  Policy ¶ 2; *see Sangster*, 2026 WL 222316, at *6.  Even if an applicant can show that they are not likely to become a public charge, the Policy instructs the consular officer to refuse the application.  *See* Policy ¶¶ 4–5.  Remarkably, it also calls on consular officers to reverse course on already positively adjudicated applications, directing them to reopen and refuse cases in which a visa has not yet been printed or, if it has, not left the consular office.  *Id.* ¶ 9.  So, Defendants terribly

misread their own Policy when they assert that it "operates only to provide guidance on future, case-specific adjudications conducted by consular officer under the INA." Defs.' Opp'n at 15.

Defendants' reliance on *Delaware Valley Regional Center* is misplaced. *See id.* at 15–16. There, the D.C. Circuit held that statements on the United States Citizenship and Immigration Services' website and in a policy manual were not final agency action because they did not "impose any new 'concrete consequences'" and merely "clarif[ied] existing duties." 106 F.4th at 1204–05 (internal quotation marks omitted) (first quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019); then quoting *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009). The opposite is true here. The Public Charge Policy does impose new concrete consequences—it mandates refusal of immigrant visa applications from 75 countries. *Cf. id.* at 1206 (finding no final agency action where the agency's statements "do not announce the automatic denial" of certain business plans for purposes of the EB-5 visa program). And it does not clarify any existing duty. Rather, the Policy imposes one and strips consular officers of any discretion to do otherwise. It is final agency action.

### b.    The merits

On the merits of the contrary-to-law claim, Plaintiffs prevail for two reasons. First, under the Public Charge Policy, the Secretary is exercising power that Congress specifically denied him. The INA expressly denies the Secretary of State "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas." 8 U.S.C. § 1104(a). Under the INA, "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer," *id.* § 1202(b), and "a consular officer may issue" visas to individuals who have "made proper application therefor," *id.* § 1201(a)(1)(A). The INA thus "grants consular officers 'exclusive authority to review applications for visas, precluding even the Secretary of State from

controlling their determinations.'"  *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021) (quoting *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (D.C. Cir. 1999)).

Under the Public Charge Policy, the Secretary of State is doing precisely what the INA prohibits: he is controlling individual visa application determinations.  Defendants posit that the Secretary's authority to direct blanket denials can be found in section 104(a) of the INA, which endows the Secretary with broad powers to administer and enforce provisions regarding visa administration.  *See* Defs.' Opp'n at 19–20 (citing 8 U.S.C. § 1104(a)).  But that very same section also *denies* the Secretary "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas."  8 U.S.C. § 1104(a).  Defendants cannot locate the Secretary's power to dictate the outcome of visa applications in a provision that expressly deprives him of that very authority.  *See Ullah v. Lafave*, No. 25-12804-LTS, 2026 WL 1541774, at *10 (D. Mass. June 2, 2026) ("The defendants do not explain how the Secretary's cable directing consular officers that they 'must refuse' visas squares with this express statutory limitation on his authority.").

The Public Charge Policy is unlawful for a second reason: it improperly strips consular officers of their statutory authority and discretion to make public charge determinations.  The INA's public charge provision provides that "[a]ny alien who, *in the opinion* of the consular officer *at the time of the application for a visa* . . . is likely at any time to become a public charge" is to be deemed ineligible to receive a visa.  8 U.S.C. § 1182(a)(4)(A) (emphasis added).  The statute lists the factors that, "at a minimum," the consular officer "shall . . . consider" in making that decision to include the applicant's age; health; family status; assets, resources, and financial status; and education and skills.  *Id.* § 1182(a)(4)(B)(i).  The Public Charge Policy plainly nullifies this discretionary authority.   It "countermands consular officers' case-specific adjudication of

12

immigrant-visa applications from the specified countries (at least, to the extent the officers do not identify any grounds to deem the applicants ineligible)." *Ullah*, 2026 WL 1541774, at *10. Instead, "they are permitted to reach only one result: refusal." *Id.* That unconditional directive is contrary to how Congress devised the public charge inquiry. *See Sangster*, 2026 WL 222316, at *6

Defendants have little else to say about either section 1104(a) or section 1182(a)(4)(A). Indeed, at oral argument, they had no answer to the court's questions about how the Public Charge Policy can be squared with them. 7/21/26 Hr'g Tr, at 17:1–21:17. In their brief, they argue that the INA requires "the legal act of issuance or refusal be performed by a consular officer applying statutory standards. That requirement is satisfied here, as consular officers continue to make § 221(g) refusal determinations in accordance with the [Public Charge Policy]." Defs.' Opp'n at 19. The Policy, however, commands just the opposite. Consular officers are not to "apply[] statutory standards," but instead refuse applicants irrespective of individual circumstances. That is contrary to the INA.

Accordingly, the court will enter judgment in favor of Plaintiffs on their contrary-to-law claim (Count V). It therefore need not reach the nationality discrimination component of that cause of action, *see* Compl. ¶ 127.a, or the *ultra vires* claim (Count IV).

### 2.    Plaintiff's Application

Having concluded that the Public Charge Policy is unlawful, the next question is whether the court can compel the State Department to act on Plaintiff's application. Defendants say the answer is "no" for three reasons: (1) consular officers do not have a clear, nondiscretionary duty to act on Plaintiff's application; (2) the consular nonreviewability doctrine bars review; and

13

(3) Plaintiffs have not demonstrated agency action either unlawfully withheld or unreasonably delayed.  Defs.' Opp'n at 8–14.  The court takes these arguments in turn.

a.      Duty to act

Courts cannot compel agency action under the APA unless the agency "failed to take a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted).  Plaintiffs maintain that the INA imposes a discrete duty on consular officers to carry out a lawful adjudication.  Pls.' Mot. at 10.  They cite two provisions of the INA and two agency regulations for that proposition.  *See id.* at 10–11; Pls.' Reply to Defs.' Opp'n, ECF No. 10 [hereinafter Pls.' Reply], at 7–8.  They start with section 222(b) of the INA, which provides in relevant part that "[a]ll immigrant visa applicants shall be reviewed and adjudicated by a consular officer."  Pls.' Mot. at 10 (quoting 8 U.S.C. § 1202(b)).  They also point to section 221(g), which permits refusal only where the applicant is ineligible under section 212 (8 U.S.C. § 1182) or another provision of law, the application fails to comply with the INA or governing regulations, or the officer knows or has reason to believe the applicant is ineligible under law.  *See id.* (citing 8 U.S.C. § 1201(g) and 22 C.F.R. § 42.81(a)).  And 22 C.F.R. § 40.6 provides that "[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations."  Together, Plaintiffs assert, "these provisions require lawful adjudication."  Pls.' Reply at 8.

Defendants do not respond to this argument at all.  *See* Defs.' Opp'n at 8–10.  Instead, they insist that the D.C. Circuit's unpublished decision in *Karimova v. Abate*, No. 23-5178, 2024 WL 3517852 (D.C. Cir. July 24, 2024), settles the question in their favor—that the INA does not impose on consular officers a nondiscretionary duty to act.  Defs.' Opp'n at 8–10.  But *Karimova* cannot sustain the weight Defendants put on it.  *Karimova* held only that "Section 555(b) [of the APA]—

14

and only Section 555(b)" does not place a "clear, nondiscretionary duty" on a consular officer to "re-adjudicate [an] already-refused application." 2024 WL 3517852, at *3.  It offered no opinion as to whether any other source of law creates a nondiscretionary duty to adjudicate a visa application.  *Cf. Nikjooy v. Rubio*, 804 F. Supp. 3d 76, 84–85 (D.D.C. 2025).  Plaintiffs here do not rely on section 555(b), so even if *Karimova* disposes of that provision as the basis for a discrete legal duty, it has no application here.  Because Defendants have failed to challenge the sources of law cited by Plaintiffs, the court need not reach the merits of their argument.  It treats the argument as conceded, *see Texas v. United States*, 798 F.3d 1108, 1114–15 (D.C. Cir. 2015) (recognizing that the district court may treat as conceded an argument to which the opposing party fails to respond), and therefore assumes that the cited statues and regulations impose a nondiscretionary duty to adjudicate an otherwise refused application.

### b. Consular nonreviewability doctrine

The consular nonreviewability doctrine does not foreclose the court's review.  The doctrine generally "shields a consular official's decision to issue or withhold a visa from judicial review." *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 556 (D.C. Cir. 2025) (internal quotation marks omitted).  But it is settled that "when plaintiffs pursue forward-looking challenges to the lawfulness of regulations or policies governing consular decisions, courts may review them 'to assure that the executive departments abide by the legislatively mandated procedures.'"  *Id.* at 560 (citation omitted).  In *Pietersen*, for instance, consular officers had denied a visa application based on a provision of the FAM that the plaintiffs argued "contravene[d] the INA."  *Id.* at 555.  The court explained that the consular nonreviewability doctrine did not apply because "[r]ather than contesting particular visa determinations by a consular officer," the plaintiffs "confine[d] their challenge to the lawfulness of the State Department policy."  *Id.* at 560.  That is precisely the case

here.  Plaintiffs do not challenge a discretionary determination but rather a policy that is preventing adjudication of the application.  *Id.*  The doctrine of consular nonreviewability therefore presents no barrier to review.

c.      The <u><i>TRAC</i> factors</u>

The APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  In deciding whether to exercise equitable powers to force agency action, *see In re Barr Lab'ys, Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991), courts rely on the six factors set forth in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*).  Those factors are:

> (1) The time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80) (internal quotation marks omitted).  Those factors typically favor the agency in visa adjudication cases.  *See Da Costa*, 80 F.4th at 340–46 (analyzing claim of unreasonable delay in adjudicating an EB-5 visa).  Not so in this one.

As to the first *TRAC* factor, "the time agencies take to make decisions *must* be governed by a 'rule of reason.'"  *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (emphasis added) (quoting *TRAC*, 750 F.2d at 80).  In the EB-5 program context, the D.C. Circuit has observed that visa processing is usually governed by a rule of reason.  *See Da Costa*, 80 F.4th at

16

340–41 (noting that, under the EB-5 program, "the government is statutorily required to issue visas in the order the petitions are filed, 8 U.S.C. § 1153(e)(1)"). This case is different. Future adjudication of Plaintiff's application is suspended indefinitely, not based on a rule of reason, but because of the unlawful Public Charge Policy. In similar circumstances, courts have found the first *TRAC* factor to weigh "strongly" in favor of the plaintiff. *See Yazdan Pouri v. DHS*, No. 26-cv-1339, 2026 WL 1508425, at *8 (D.D.C. May 30, 2026) (finding the first *TRAC* factor to "strongly" favor a finding of unreasonable delay where the reason for the inaction was due to an unlawful indefinite suspension of processing of applications by nationals of certain countries). This court does, as well.

As to the second factor—whether Congress has provided a timetable or other indication of speed by which the agency must proceed—that favors Defendants. Only three months have passed since Plaintiff submitted his medical examination, rendering his application complete for a final adjudication. That wait time is not lengthy by ordinary measures. *Cf. Da Costa*, 80 F.4th at 337 (discussing processing times for EB-5 applicants' I-526 petitions). This factor therefore weighs against Plaintiffs.

The third and fifth *TRAC* factors, which together concern the impact of agency inaction, *see id.* at 344, favor Plaintiffs. To prevail, a visa applicant must "link[] the delayed adjudication of their petition to health or welfare harms." *Id.* at 345; *see TRAC*, 750 F.2d at 80 ("[T]he court should . . . take into account the nature and extent of the interests prejudiced by delay . . . ."). The primary prejudice of further delay here is the "significant risk that [Plaintiff's] death comes before visa issuance, permanently extinguishing his family's derivative eligibility." Pls.' Mot. at 15. The risk is verified. A recent letter from Plaintiff's treating physician states: "Given his terminal diagnosis, ongoing disease activity, and overall vulnerable medical condition, there is a

real and constant risk of rapid clinical deterioration, serious complications, or death." Herchenhorn Ltr. at 2. "Because of his highly fragile clinical state and incurable disease, it is medically reasonable and extremely important for him to resolve major legal, immigration, family, and life-planning matters as promptly as possible." *Id.* The permanent loss of the opportunity to immigrate to the United States tips the third and fifth *TRAC* favors in Plaintiffs' favor. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 196 (D.D.C. 2020).[4]

The fourth *TRAC* factor, the effect on competing agency priorities, typically would favor Defendants because "a judicial order putting [the petitioner] at the head of the queue simply moves all others back one space and produces no net gain." *Da Costa*, 80 F.4th at 343 (internal quotation marks omitted). That is not the case here. Under the Public Charge Policy, the final adjudication of *all* immigrant visa applications in 75 countries has ground to a halt. True, ordering Defendants to adjudicate Plaintiff's individual application would move him towards the front of the queue worldwide, but that queue is not moving in 75 countries. Plaintiffs might displace an EB-5 investor who is a national of a country not subject to the Public Charge Policy, but such an applicant's position is due in part to an unlawful policy. Placing Plaintiffs back on equal footing therefore will not cause an "offsetting burden[] on equally worthy EB-5 petitioners." *Da Costa*, 80 F.4th at 344 (internal quotation marks omitted).

Finally, the sixth *TRAC* factor, is neutral. *See id.* at 345–46. The court need not consider whether there is "any impropriety lurking behind agency lassitude" because such a finding is not necessary to hold that an agency action is unlawfully withheld. *Cf. TRAC*, 750 F.2d at 80.

---

[4] The court recognizes that, strictly speaking, additional delay in adjudicating Plaintiff's application will not result in added injury to Plaintiff's health and welfare—the two are not causally related. But in this court's view, the possible lost opportunity to immigrate, after waiting for over six years since he filed his application, constitutes a substantial harm.

In summary, most of the *TRAC* factors weigh in Plaintiffs' favor. Only the second does not. The court therefore will enter judgment in favor of Plaintiffs on their unlawfully withheld claim (Count I). The court thus does not reach the separate unreasonable delay claim (Count II). The court does, however, dismiss the mandamus "claim" (Count III), as mandamus jurisdiction cannot lie when an adequate remedy is available, as here, under APA. *See Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983).

## V.    CONCLUSION

As relief, the court (1) declares the Public Charge Policy and the withholding of approval of Plaintiffs' immigrant visas based on that policy to be unlawful and (2) enjoins Defendants from applying the Public Charge Policy to Plaintiff's application. The court further orders Defendants to re-adjudicate Plaintiff's application on an individualized basis under the INA and applicable regulations no later than 60 days after the application is deemed complete by a consular officer. The court understands that Plaintiff's medical examination is now stale due to the passage of time, and he will have to secure another one before the application can be finally adjudicated. *See* 7/23/26 Tr. at 2:13–3:19. To be clear, this relief does not compel any particular visa determination or foreclose a consular officer from seeking whatever additional information is deemed necessary to adjudicate the application.

For the foregoing reasons, treating Plaintiffs' Motion for Preliminary Injunction, ECF No. 3, as one for summary judgment, that motion is granted. The court will enter judgment in Plaintiffs' favor. A separate final, appealable order accompanies this Memorandum Opinion.

Dated:  July 31, 2026

Amit P. Mehta
United States District Judge

19